# UNITED STATES BANKRUPTCY COURT

## DISTRICT OF NEW MEXICO

In re:

MOTIVA PERFORMANCE                                    Case No. 19-12539-t7
ENGINEERING, LLC,

     Debtor.

## <u>OPINION</u>

Before the Court is the chapter 7 trustee's motion to approve his compromise with Creig Butler. An evidentiary hearing on the motion was held on May 6, 2021. Having considered the evidence and relevant law, the Court concludes that the motion should be granted.

A.     <u>Facts</u>.[1]

The Court finds:

William Ferguson is a well-known local attorney. Together with partners David Rochau and Scott Fox, Ferguson owned and operated Motiva Performance Engineering, LLC, an automobile performance modification business that also sold turbo and exhaust kits and exotic used cars.

Ferguson also owns several other businesses, including Dealerbank Financial Services, Ltd, (auto financing and leasing); Armageddon High Performance Solutions (manufactures turbo kits); Armageddon Tool & Die (no active operations); and Avatar Recoveries (miscellaneous investments) (together, the "Ferguson Affiliates"). Avatar Recoveries owned the building that was leased to Motiva.

---

[1] The Court takes judicial notice of its docket and of the docket in the state court action brought by Butler against Motiva, No. D-202-CV-2017-01393. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).

In 2014 Creig Butler hired Motiva to upgrade a 2009 Hummer H3TX. The work did not go well. Butler sued Motiva on February 28, 2017, in the Second Judicial District, State of New Mexico, No. D-202-CV-2017-01393 (the "State Court Action"). In his complaint Butler alleged that Motiva agreed to upgrade the Hummer for $20,000, but two years and $70,000 later, Motiva returned the Hummer in an undrivable condition. On October 26, 2018, after a four-day trial, a jury returned a verdict against Motiva for $292,001 plus costs, attorney fees, and post-judgment interest. The judgment was increased to $337,317.90 on April 3, 2019, to include attorney fees and costs.

On November 26, 2018, the state court issued a writ of execution, directing the sheriff to levy Motiva's property to satisfy the judgment. On December 5, 2018, Sheriff's Deputy Carlos Gutierrez served the writ, and he prepared to levy Motiva's property. Gutierrez observed 40-50 boxed turbo kits and rows of industrial shelving stocked with additional turbo kits. He also observed tools, equipment, and cars. Before the deputies could levy, however, Ferguson intervened. He told Gutierrez that Avatar Recoveries had a landlord's lien on all of Motiva's property, superior to Butler's judgment. Ferguson threatened to sue Gutierrez personally if he levied any of Motiva's property and insisted that Gutierrez call the county attorney. After speaking with the county attorney, Gutierrez left Motiva without levying any property.

Butler went back to state court. He sought and obtained a preliminary injunction freezing Motiva's assets, including a 2012 Ferrari FF[2] and $40,948.49 in insurance proceeds for damage to the Ferrari.[3] The state court also added Ferguson and some of the Ferguson Affiliates as "relief

_____

[2] The Ferrari had been titled in Motiva's name for four years, but Ferguson transferred the title to Dealerbank four days after the jury verdict in Butler's favor.
[3] Details of the state court proceedings and issues of Motiva's ownership of the Ferrari, etc., are set forth in detail in the Court's Opinion filed September 8, 2020, doc. 117.

defendants" in the State Court Action, which gave the court jurisdiction over them so the court could determine which assets Motiva owned. Unbeknownst to Butler, his counsel, or the state court, while Ferguson and Butler's counsel were negotiating the form of order related to the preliminary injunction, Dealerbank borrowed $120,000 from a local bank and pledged the Ferrari as collateral. Dealerbank used the loan proceeds to pay down Ferguson's line of credit at the lending bank. The court's preliminary injunction order was entered on May 7, 2019.

In early October 2019, the state court held an evidentiary hearing on who owned the Ferrari, the turbo kits, and Motiva's other assets. The court issued 129 findings of fact and conclusions of law on October 28, 2019 (the "Ownership Order"). The state court found, inter alia, that Motiva owned the Ferrari and the insurance proceeds;[4] that Ferguson wrongfully and inequitably asserted that Avatar had a landlord's lien on Motiva's property so that he could delay Gutierrez's levy; and that Motiva's property, including the proceeds of any sales after December 5, 2018, was subject to execution and/or garnishment. The court ordered that the Ferrari be returned to Motiva, free and clear of liens; that Ferguson account for the insurance proceeds and pay them to Butler or Motiva; that the sheriff levy the Ferrari and insurance money to satisfy Butler's judgment; and that Butler could seek a further order recovering proceeds from the Ferguson Affiliates' earnings after October 26, 2018, if necessary to satisfy the judgment.

On November 1, 2019, Motiva filed this case. It was convedred from chapter 11 to chapter 7 on April 15, 2020. Philip Montoya was appointed the chapter 7 trustee.

Postpetition, Butler's counsel learned that Dealerbank had encumbered the Ferrari. Arguing that the Ferguson entities and/or Ferguson violated the preliminary injunction by using

---

[4]The state court's findings in this regard are set forth in doc. 117.

the Ferrari as collateral, Butler moved for stay relief so he could seek a contempt order from the state court. The Court granted the motion.

Butler filed a motion in the state court for an order to show cause why Ferguson and his affiliates should not be held in contempt and sanctioned for violating the preliminary injunction. In January 2021, the state court entered *Findings of Fact and Conclusion of Law on Order to Show Cause and Order of Civil Contempt and Sanctions Against Dealerbank, William S. Ferguson, and the Law Firm*. In summary, the court found that Ferguson and his affiliates deliberately circumvented the court's authority by encumbering the Ferrari. The Court also called into question Ferguson's veracity and ethics in a number of ways. To purge the contempt, Ferguson, Dealerbank, and the law firm were ordered to remove the lien on the Ferrari, transfer title to Motiva free and clear of liens, and deposit the insurance proceeds into the court registry for later disposition.

Separately, the court held that Ferguson "may purge the civil contempt as to him" by paying Butler's judgment in full.

In September 2020 the chapter 7 trustee reached an agreement with Ferguson and the Ferguson Affiliates, whereby Armageddon would purchase Motiva's inventory of turbo kits and related items for $20,000; Ferguson would turn over $30,938.49 held in Motiva's debtor-in-possession account to the chapter 7 trustee; and Ferguson agreed the estate had no liability for a $41,000.00 "loan" he to Motiva. The Court approved the agreement on October 29, 2020.

In January 2021, the chapter 7 trustee struck a deal with Creig Butler to settle a number of potential disputes with the estate.[5] The terms of the settlement are:

---

[5] The areas of potential disagreement include: Is Butler's claim secured? Under what theory? With respect to which assets? Will there be a "race to the courthouse" to see which party can recover from a Ferguson Affiliate? Does the automatic stay apply to any claims Butler may wish to pursue? Is there overlap between Butler's claims and the estate's?

- Butler agrees that he does not have a lien on estate property;
- The trustee will pursue estate claims against the Ferguson Affiliates, while Butler will pursue his individual claims against the Ferguson Affiliates. The recoveries will be pooled;
- The trustee will hire Butler's counsel as special counsel, on a contingency fee basis, to pursue estate claims. Some claims may be pursued separately and some together;
- Recovered funds will be distributed as follows:
  - First, to pay attorney fees;
  - Second, $35,000 is paid to Butler;
  - Third, $15,000 is paid to the estate;
  - Fourth, all remaining funds are split between Butler (70%) and the estate (30%)
- Butler will be entitled to a distribution from the estate (to the extent funds remain after paying administrative expenses and payment of priority claims), but Butler's claim shall be reduced by the funds he has received.

In April 2021, the chapter 7 trustee sold the Ferrari for $82,200. The estate has a little over $133,000 in cash.

The following claims have been filed:

| Claimant | Amount | |
|---|---|---|
| IRS | $29,419 | Priority tax |
| NMTRD | $28,223.07 | Priority tax |
| U.S. Trustee | $977.71 | Chapter 11 UST fees |
| Ferguson | $2,731.63 | Post-petition insurance |
| Avatar Recoveries | $135,000 | Rent |
| Armageddon Tool & Die | $52,000 | Money loaned |
| Butler | $461,083.53 | Judgment |

The trustee filed a motion to approve his settlement with Butler. The Ferguson Affiliates filed the only objection, arguing that Butler's interests are not aligned with the trustee's and that the settlement is not fair to unsecured creditors.

B.    Court Approval of Compromises.

Fed. R. Bankr. P. 9019(a) provides in part: "[o]n motion by the trustee and after notice and a hearing, the court may approve a compromise or settlement." "Compromises are favored in bankruptcy" insofar as they "allow the trustee and the creditors to avoid the expenses and burdens

associated with litigating sharply contested and dubious claims." *In re S. Med. Arts Cos., Inc.*, 343 B.R. 250, 255–56 (10th Cir. BAP 2006) (citations omitted). To garner court approval, a compromise must be "fair and equitable and in the best interests of the estate." *In re Rich Global, LLC*, 652 F. App'x 625, 631 (10th Cir. 2016). The trustee bears the burden of proving that a compromise satisfies this standard. *In re Wiley*, 2010 WL 964082, at *4 (Bankr. D.N.M.).

In considering whether to approve a compromise, the "Court [should] not substitute its own judgment for that of the Trustee," nor should it "rely solely on the trustee's business judgment." *Id.* Instead, the Court must make an "informed and independent judgment," as to whether the terms of the compromise are superior to the likely rewards of litigation. *Protective Comm. For Ind. Stockholders of TMT Trailer Ferry, Inc. v. Anderson*, 390 U.S. 414, 424-25 (1968). As a framework for making this determination, the Bankruptcy Appellate Panel for the Tenth Circuit identified four factors (commonly known as the "*Kopexa* factors") that bankruptcy courts should consider in determining the propriety of a settlement. *C.K. Williams, Inc. v. All Am. Life Ins. Co. (In re Kopexa Realty Venture Co.)*, 213 B.R. 1020, 1022 (10th Cir. BAP 1997). The *Kopexa* factors are: (1) the probable success of the underlying litigation on the merits; (2) the possible difficulty collecting a judgment; (3) the complexity and expense of the litigation; and (4) the interest of creditors in deference to their reasonable views.

C.   Probable Success of the Underlying Litigation on the Merits.

In examining the prospect of litigation success, the court should not conduct a "mini-trial" to determine the probable outcome of litigation resolved in a settlement. *Wiley*, 2010 WL 964082, at *4, citing *In re Cajun Elec. Power Coop., Inc.*, 119 F.3d 349, 356 (5th Cir. 1997) ("[I]t is unnecessary to conduct a mini-trial to determine the probable outcome of any claims waived in the settlement."). Instead, the Court should "apprise itself of the relevant facts and law so that [it]

can make an informed and intelligent decision[.]" *Cajun Elec. Power*, 119 F.3d at 356, citing *In re Am. Reserve Corp.*, 841 F.2d 159, 163 (7th Cir. 1987).

As mentioned above, there are a number of potential disagreements between the trustee and Butler, any of which could blossom into litigation. While it is not practical to identify each potential dispute and estimate the estate's probability of success, the Court will focus on the most important disagreement: whether Butler's claim is secured.

Butler makes two arguments in support of his assertion that his claim is secured. First, he argues that the attempt to levy Motiva's assets created a lien on its personal property. Secondly, he argues that the state court's preliminary injunction, combined with Ferguson's conduct support the imposition of an equitable lien.

In support of his argument that his writ of execution created a lien on Motiva's personal property, Butler cites *In re Shurtleff*, 170 B.R. 54, 55-56 (Bankr. N.D.N.Y. 1994). In *Shurtleff*, the bankruptcy court applied New York law and held that "the judgment became a lien on the '[d]ebtor's interest in [certain accounts] . . . when the [e]xecutions were delivered to the Sheriff.'" *Id.* at 55-56.

Two additional cases, applying Florida law, reached the same result. *See Jacksonville Bulls Football, Ltd. v. Blatt*, 535 So. 2d 626, 630-31 (Fla. App. 1988) (a "judgment creditor's lien attaches to personal property . . . at the time the writ of execution is delivered to the sheriff in the county where the personal property is located"); *In re Trodglen*, 155 B.R. 601, 603 (Bankr. S.D. Fla. 1993) (citing a Florida statute that "generally effects a judgment lien on personal property upon the docketing of a writ of execution with the sheriff").

The only relevant New Mexico authority that could support Butler's theory, NMSA 1978, § 39-5-13 provides:

> The lien of the levy upon the property shall continue until the debt is paid, and the clerk, unless otherwise directed by the plaintiff, shall forthwith issue another execution, reciting the return of the former execution, the levy and failure to sell, and directing the sheriff to satisfy the judgment out of the property unsold, if the same is sufficient, if not, then out of any other property of the debtor, subject to execution.

*See Von Segerlund v. Dysart,* 137 F.2d 755, 758 (9th Cir. 1943) ("Independent research has convinced us that New Mexico follows the general law regarding the creation of a lien on personalty as a result of a levy under a writ of execution.").

Although Ferguson interrupted the levy, Butler cites *Palais v. DeJarnette*, 145 F.2d 953, 954-55 (4th Cir. 1944), in which the Fourth Circuit, applying Virginia law, held that a levy remains valid even if the sheriff does not actually seize the property upon execution; if the sheriff serves the writ of execution and sees the property to be levied upon before the return day of the writ, it remains within his power to sell the property. *Accord Hart v. Oliver Farm Equip. Sales Co.*, 21 P.2d 96, 103 (N.M. 1933) (recognizing the principle of "constructive seizure" and stating that "[i]t is not always essential to the validity of a levy that the attaching officer lay hands upon or remove the property attached, especially[] where . . . the property is . . . cumbrous . . . and removal would be attended with great expense or difficulty.").

Butler's equitable lien argument also has some support. [6] "Equitable liens are imposed when no other adequate remedy at law exists." *In re Dorado Marine, Inc.*, 321 B.R. 581, 587 (Bankr. M.D. Fla. 2005). A bankruptcy court considering whether an equitable lien is appropriate

---

[6] Butler cites *In re Fraden*, 317 B.R. 24, 37 (Bankr. D. Mass. 2004) ("When [a] creditor . . . obtains a temporary restraining order or preliminary injunction preventing the defendant from disposing of, transferring or assigning the property sought to be reached and applied, the property is charged with an equity for the security of the plaintiff, and is taken directly into the control of the court."); and *McCarthy v. Rogers*, N.E.2d 787, 788 (Mass. 1936) ("when a plaintiff . . . has obtained a temporary injunction preventing assignment of the property by the defendant debtor, he has acquired an equitable lien upon it").

must first determine whether it is permissible under state law. *Id.*; *In re Czebotar*, 5 B.R. 379, 381 (Bankr. E.D. Wash. 1980) (state law controls the question whether an equitable lien should be imposed by a bankruptcy court). Courts in New Mexico "recognize two types of equitable liens, one based on agreement, and the other constituting a 'remedial device, used to enforce a right to restitution in order to prevent unjust enrichment.'" *Arena Res., Inc. v. Obo, Inc.*, 238 P.3d 357, 361 (N.M. App. 2010). The latter type "may be declared by a court of equity out of general considerations of right and justice as applied to the relationship of the parties." *Caldwell v. Armstrong*, 342 F.2d 485, 490 (10th Cir. 1965); *see also Title Guar. & Ins. Co. v. Campbell*, 742 P.2d 8, 14 (N.M. App. 1987) (when a party asserts that an outcome is fundamentally inequitable, the court considers whether facts and circumstances justify an equitable lien as a remedial device).

New Mexico law could support an equitable lien on Motiva's property arising at or around the time that the state court issued its preliminary injunction[7] based on Ferguson's conduct to avoid paying Butler's judgment. For example, in *Petritis v. Simpier*, 474 P.2d 490, 494 (N.M. 1970), the New Mexico Supreme Court held that creditors had an equitable lien on proceeds from the sale of retail merchandise where the owner of the retail establishment used "a spurious attachment proceeding" to claim the proceeds for himself. 474 P.2d at 494. The court reasoned:

> [w]e do not deem it necessary to examine our Bulk Sales law and the rights of creditors under such circumstances, for it is apparently inequitable and contrary to good conscience to allow [the business owner] to enrich himself at the expense of his creditors. . . . The situation is quite classic for the imposition of an equitable lien.

*Id*. Similarly, in *Coppler & Mannick, P.C. v. Wakeland*, 117 P.3d 914 (N.M. 2005), the New Mexico Supreme Court permitted an equitable lien to attach to a debtor's homestead exemption

---

[7] *See generally In re Cedar Funding, Inc.*, 398 B.R. 346, 350 (Bankr. N.D. Cal. 2008) ("Equitable liens are closely related to constructive trusts"; "both remedies relate back in time to the conduct on which they are founded.")

because the debtor, facing foreclosure, caused significant damage to the property and fraudulently attempted to encumber the water rights for the sole purpose of reducing the creditor's recovery. 117 P.3d at 915, 918-19.

In summary, Butler's claim could be secured by a lien of some kind. The trustee's desire to compromise this dispute is reasonable.

D.    The Possible Difficulty in Collecting a Judgment.

This factor is neutral because the trustee would not need to collect a judgment from Butler—their only dispute at this juncture is whether Butler's claim is secured or unsecured.

E.    The Complexity and Expense of the Litigation.

This factor favors the settlement. There are layers of complexity related to whether Butler has a lien on Motiva's assets. Both parties would need to research, brief, and try the issue. The litigation would be costly, time consuming, and uncertain.

F.    The Interest of Creditors in Deference to Their Reasonable Views.

In exchange for agreeing to give Butler more from any recovery than he would get if there were no settlement and his secured claim were disallowed,[8] the estate gets:

- A favorable resolution of the lien dispute;
- A share of any recovery from Butler's independent claims;
- Saving the attorney fees that would be spent litigating with Butler;
- The benefit of using Butler's counsel, who has been litigating with Ferguson for five years; and
- No out-of-pocket attorney fees to pursue the claims against Ferguson and the Ferguson Affiliates.

In contrast, if the trustee lost the lien dispute he might end up with no funds at all and an administratively insolvent estate. Given this possibility, the settlement is well within the range of reasonableness from the standpoint of unsecured creditors.

---

[8] The Court calculates that Butler's percentage would increase by about 20%.

G.     The Interests of the Trustee and Butler are Sufficiently Aligned.

The Ferguson Affiliates object to the compromise on the ground that there is an irreconcilable conflict of interest between the estate and Butler that prevents Butler's attorneys from representing the trustee. *See, e.g., In re First State Bancorporation*, 2013 WL 823414, at *8 (Bankr. D.N.M.) (a "conflict of interest exists where there is active competition between two interests, in which one interest can only be served at the expense of the other"). That argument must be overruled. The compromise resolves the main conflicts of interest by treating Butler as an unsecured creditor and by pooling his individual claims with the estate's claims. Because of these compromises, Butler, like the trustee, is motivated to maximize the net recovery for the estate. *See id.* at *7 ("A chapter 7 trustee's primary role in administering a debtor's bankruptcy estate is to liquidate property for the benefit of unsecured creditors."). To the extent some other potential conflict of interest *could* arise, such dormant conflicts do not disqualify Butler's attorneys from representing both parties. *See, e.g., In re Johnson*, 312 B.R. 810, 822 (Bankr. E.D. Va. 2004) ("A conflict in which the competition is presently dormant, but may become active if certain contingencies occur, is merely potential and thus does not warrant disqualification.").

Conclusion

The compromise is a creative and fair resolution of the estate's potential disputes with Butler. The Court will enter a separate order consistent with this opinion.

_____
Hon. David T. Thuma
United States Bankruptcy Judge

Entered: June 3, 2021
Copies to: electronic notice recipients