UNITED STATES BANKRUPTCY COURT

DISTRICT OF NEW MEXICO

In re:

MOTIVA PERFORMANCE
ENGINEERING, LLC,    Case No. 19-12539-t7

    Debtor.

# OPINION

Before the Court is William Ferguson's motion for a ruling that the case trustee must retain new counsel in a pending adversary proceeding (now on appeal) against Ferguson. Ferguson argues that new counsel is necessary because an actual conflict of interest has arisen between the estate and its biggest creditor, Creig Butler. The trustee's current counsel represents both and could not do so if Ferguson is right. The matter has been fully briefed and argued. The Court concludes that Ferguson's premise is flawed—no actual conflict has arisen. Because of that, his motion will be denied.

A.    Facts.[1]

    The Court finds:[2]

William Ferguson is a well-known local attorney. Together with partners David Rochau and Scott Fox, Ferguson owned and operated Motiva Performance Engineering, LLC, an automobile performance modification business that also sold turbo and exhaust kits and exotic used cars.

---

[1] The Court takes judicial notice of the docket in this case. *See St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp.*, 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may sua sponte take judicial notice of its docket and of facts that are part of public records).
[2] Some of the Court's findings are in the discussion section of the opinion. They are incorporated by this reference.

Ferguson owns several other businesses, including Dealerbank Financial Services, Ltd; Armageddon High Performance Solutions; Armageddon Tool & Die; and Avatar Recoveries (together, the "Ferguson Affiliates").[3] Avatar Recoveries owned the building that was leased to Motiva.

In 2014 Creig Butler hired Motiva to upgrade a 2009 Hummer H3TX. The work did not go well. Butler sued Motiva on February 28, 2017, in the Second Judicial District, State of New Mexico, No. D-202-CV-2017-01393 (the "State Court Action"). In his complaint Butler alleged that Motiva agreed to upgrade the Hummer for $20,000,[4] but two years and $70,000 later, Motiva returned the Hummer in an undrivable condition. On October 26, 2018, after a four-day trial, a jury returned a verdict against Motiva for $292,001 plus costs, attorney fees, and post-judgment interest. The judgment was increased to $337,318 on April 3, 2019, to include additional attorney fees and costs.

On November 26, 2018, the state court issued a writ of execution, directing the sheriff to levy Motiva's property to satisfy the judgment. On December 5, 2018, deputy sheriff Carlos Gutierrez served the writ and prepared to levy Motiva's property. Gutierrez observed 40-50 boxed turbo kits and rows of industrial shelving stocked with additional turbo kits. He also observed tools, equipment, and cars. Before Gutierrez could levy, however, Ferguson intervened. He told Gutierrez that Avatar Recoveries had a landlord's lien on all of Motiva's property, superior to Butler's judgment. Ferguson threatened to sue Gutierrez personally if he levied any of Motiva's property. He insisted that Gutierrez call the county attorney. After speaking with the county attorney, Gutierrez left Motiva without levying any property.

---

[3] For ease of reference only, Ferguson and one or more of the Ferguson Affiliates are sometimes referred to as "Ferguson."
[4] Unless part of quoted text, all dollar figures are rounded to the nearest dollar.

Butler went back to state court. He sought and obtained a preliminary injunction freezing Motiva's assets, including a 2012 Ferrari FF[5] and $40,948 in insurance proceeds for damage to the Ferrari.[6] The state court added Ferguson and some of the Ferguson Affiliates as "relief defendants" in the State Court Action so the court could determine which assets Motiva owned. Unbeknownst to Butler, his counsel, or the state court, while Ferguson and Butler's counsel were negotiating the form of order related to the preliminary injunction, Dealerbank borrowed $120,000 from a local bank and pledged the Ferrari as collateral. Dealerbank used the loan proceeds to pay down Ferguson's line of credit at the lending bank. The court's preliminary injunction order was entered on May 7, 2019.

In early October 2019, the state court held an evidentiary hearing on who owned the Ferrari, the turbo kits, and Motiva's other assets. The court issued 129 findings of fact and conclusions of law on October 28, 2019. The state court found, inter alia, that Motiva owned the Ferrari and the insurance proceeds;[7] that Ferguson wrongfully and inequitably asserted that Avatar had a landlord's lien on Motiva's property so that he could delay the sheriff's levy; and that Motiva's property, including the proceeds of any sales after December 5, 2018, was subject to execution and/or garnishment. The court ordered that the Ferrari be returned to Motiva, free and clear of liens; that Ferguson account for the insurance proceeds and pay them to Butler or Motiva; that the sheriff levy the Ferrari and insurance money to satisfy Butler's judgment; and that Butler could seek a further order recovering proceeds from the Ferguson Affiliates' earnings after October 26, 2018, if necessary, to satisfy the judgment.

---

[5] The Ferrari had been titled in Motiva's name for four years, but Ferguson transferred the title to Dealerbank four days after the jury verdict in Butler's favor.
[6] Details of the state court proceedings and issues of Motiva's ownership of the Ferrari, etc., are set forth in detail in the Court's Opinion filed September 8, 2020, doc. 117.
[7] The state court's findings in this regard are set forth in doc. 117.

On November 1, 2019, Motiva filed this case. It was converted from chapter 11 to chapter 7 on April 15, 2020. Philip Montoya was appointed the chapter 7 trustee (the "Trustee"). The Trustee retained Lane & Nach, P.C., as his general bankruptcy counsel, in which capacity it continues to serve.

Postpetition, Butler's counsel learned that Dealerbank had encumbered the Ferrari. Arguing that the Ferguson Affiliates and/or Ferguson violated the preliminary injunction by using the Ferrari as collateral, Butler moved for stay relief so he could seek a contempt order from the state court. The Court granted the motion.

Butler filed a motion in the state court for an order to show cause why Ferguson and his affiliates should not be held in contempt and sanctioned for violating the preliminary injunction. In January 2021, the state court entered *Findings of Fact and Conclusion of Law on Order to Show Cause and Order of Civil Contempt and Sanctions Against Dealerbank, William S. Ferguson, and the Law Firm*. In summary, the court found that Ferguson and his affiliates deliberately circumvented the court's authority by encumbering the Ferrari. The court also called into question Ferguson's veracity and ethics in a number of ways. To purge the contempt, Ferguson, Dealerbank, and the law firm were ordered to remove the lien on the Ferrari, transfer title to Motiva free and clear of liens, and deposit the insurance proceeds into the court registry for later disposition.

Separately, the court held that Ferguson "may purge the civil contempt as to him" by paying Butler's judgment in full.

-4-
Case 19-12539-t7    Doc 224    Filed 05/26/23    Entered 05/26/23 10:56:13 Page 4 of 13

In January 2021, the Trustee struck a deal with Butler that settled several disputes Butler had with the estate.[8] The terms of the settlement are:

> a. Butler will waive and release his alleged secured claim on funds [sic] approximately $50,000.00 in funds arising out of the Ferguson Compromise Application[9] and on any future recovery by the Trustee, including the Estate's portion of the proceeds to be recovered under the terms of this agreement, if the Application is granted.
> b. The Trustee shall pursue the claims of the estate against the affiliates and insiders of the Debtor, including, without limitation, the claims in the Adversary Proceeding,[10] fraudulent transfer claims, breach of fiduciary duty claims, and alter ego claims ("Claims"). Butler shall pursue all claims he has against the same parties. Any and all recovery on the Estate's Claims and Butler's claims, will be pooled. This pooling does not include claims of the Estate against third parties other than Ferguson, the entities Ferguson controls, and insiders of the Debtor (although none are known at this time).
> c. The Trustee will file an application to hire the Modrall Sperling Law Firm as special counsel to pursue the Claims.
> d. Butler and the Trustee may pursue some of the Claims, and Butler's companion claims, as joint plaintiffs or separately in different matters. Butler shall be granted relief from any stays or injunctions to pursue his separate claims hereunder.
> e. To the extent the claims pursued by Butler or the Claims being pursued on behalf of the estate result in funds being received, they shall be distributed as follows: First, payment of approved fees, costs and tax to special counsel; then second Butler will receive $35,000; then third the Trustee for the benefit of the Estate will receive $15,000; then fourth 70% of additional funds received to Butler and 30% of additional funds received to the Trustee for the benefit of the Estate; then finally, to the extent funds remain after payment of all allowed estate claims, 100% of funds received to the equity holders of the Debtor.
> f. Butler will be entitled to a distribution from the estate (to the extent funds remain after paying administrative expenses and payment of priority claims), but Butler's claim shall be reduced by the funds he has received, e.g. the $35,000.00 plus 70% of funds he would receive.

---

[8] The areas of potential disagreement included whether Butler's claim was secured by any estate assets, whether there would be a "race to the courthouse" to see which party could recover from Ferguson or an affiliate, whether the automatic stay applied to any claims Butler might wish to pursue, and whether there is any overlap between Butler's claims and the estate's.
[9] A motion filed in the Adversary Proceeding (see footnote 10) seeking approval of a compromise reached between the Trustee and Ferguson on the disputes at issue.
[10] A proceeding filed by the debtor in possession against Ferguson and others for turnover of the Ferrari, the insurance proceeds, and the inventory of turbo kits. The proceeding has been settled.

(the "Pooling Agreement").

The Trustee filed a motion to approve the Pooling Agreement. Ferguson filed the only objection, arguing that Butler's interests were not aligned with the Trustee's and that the settlement was not fair to unsecured creditors. On June 4, 2021, the Court approved the Pooling Agreement.[11] The Court entered an order approving the Trustee's employment of the Modrall firm as special counsel on June 22, 2021.

The Trustee, through its special counsel the Modrall firm, sued Ferguson in September 2021, asserting eight claims. The proceeding was tried in August 2022. The Court entered judgment against the defendants in October 2022. Defendants appealed the judgment, which is now pending before the Tenth Circuit Bankruptcy Appellate Panel.

On December 1, 2022, Ferguson paid $491,547 to the Modrall firm, which was the principal amount of Butler's state court judgment against Motiva, plus interest accrued through November 30, 2022 (the "Judgment Payment"). In accordance with the Pooling Agreement, Butler delivered the Judgment Payment to the Trustee. On December 9, 2022, the Trustee filed a report of receipt of funds and notice of distribution, stating:

> Trustee report having received the following amounts: $3,500.00 from Armageddon Tool & Die and $491,547.20 from the Ferguson parties for a total of $495,077.20.
> Pursuant to the terms of the Court Order approving the Settlement Motion, the Trustee shall distribute the following amounts: (a) Approved fees and costs of Modrall Sperling ("Special Counsel") in the amount of $218,765.27; (b) 70% of net recovery in the amount of $193,418.35[12] to creditor Creig Butler payable as

---

[11] The Pooling Agreement was a good deal for the estate and its creditors. It prevented a "race to the courthouse," which otherwise Butler seemed likely to win, having obtained his judgment prepetition. Instead of fighting over who owned what claims, the Trustee and Butler's interests were aligned. Furthermore, the estate obtained the use of Butler's counsel, who was thoroughly familiar with the case and had a track record of success. The "contingent hourly rate" fee structure the Modrall firm agreed to, subject to Court approval of the Pooling Agreement, is very favorable to the estate.

[12] The "Pooled Funds Distribution."

follows: "Modrall Sperling in Trust for Creig Butler" and (c) 30% of the recovery shall retained for the Estate in the amount of $82,893.58.

On February 27, 2023, the Trustee filed a motion to clarify that the Modrall firm's employment as special counsel including work on the appeal.[13] Again, Ferguson was the only objecting party. He argued that the motion to clarify should be denied because an actual conflict of interest had arisen between the Trustee and Butler, requiring that the Trustee retain new counsel. The alleged conflict is that, given Butler's receipt of the Judgment Payment, Butler's claim in the bankruptcy case has been paid in full. Ferguson argues that, because Butler disagrees with that position and contends that his claim has only been reduced by the Pooled Payment Distribution, there is an actual conflict between the parties to the tune of $298,129.[14]

The Trustee asserts, on the other hand, that no conflict has arisen. He argues that Ferguson's conflict of interest theory is based on a misreading of the Pooling Agreement. The Trustee reads the Pooling Agreement to reduce Butler's claim by the amount of the Pooled Funds Distribution, not the Judgment Payment.

The Court granted the motion to clarify, allowing the Modrall firm to continue to represent the Trustee in the appeal. However, the Court treated Ferguson's conflict of interest argument as a separate motion, i.e., seeking a ruling that a disqualifying conflict had arisen. The issue was taken under advisement.

---

[13] The order approving the Modrall firm's employment is silent on this point.

[14] Ferguson also argues that a disqualifying conflict of interest has arisen between the Trustee and Butler because Butler "may dispute the terms of the 9019 regarding treatment of the approximately $50,000.00 that was already held by the Trustee from the sale of Inventory and turnover of the DIP account." At the final hearing, the Trustee's counsel informed the Court that the potential dispute has been resolved. In any event, it does not appear to be of sufficient magnitude to require the Trustee to obtain new special counsel in the adversary proceeding against Ferguson. If any action has to be taken on the $50,000 dispute, the Trustee could use his general bankruptcy counsel and Butler could retain separate counsel. There would be no need to replace the Modrall firm as the Trustee's special counsel in the adversary proceeding.

-7-
Case 19-12539-t7    Doc 224    Filed 05/26/23    Entered 05/26/23 10:56:13 Page 7 of 13

B.      Rules About Joint Representation and Conflict of Interest.

Rule 16-107 of the New Mexico Rules of Professional Conduct provides:

> A.   Representation Involving Concurrent Conflict of Interest. Except as provided in Paragraph B of this rule, a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if:
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is a significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or a third person or by a personal interest of the lawyer.
>
> B.   Permissible Representation When Concurrent Conflict Exists. Notwithstanding the existence of a concurrent conflict of interest under Paragraph A of this rule, a lawyer may represent a client if:
> (1) the lawyer reasonably believes that the lawyer will be able to provide competent and diligent representation to each affected client;
> (2) the representation is not prohibited by law;
> (3) the representation does not involve the assertion of a claim by one client against another client represented by the lawyer in the same litigation or other proceeding before a tribunal; and
> (4) each affected client gives informed consent, confirmed in writing.

Addressing conflicts of interest, in *In re Stein*, 143 N.M. 462 (S. Ct. 2008), the New Mexico Supreme Court held:

> Under the New Mexico Rules of Professional Conduct, an attorney "should not represent a client whose interests are adverse to those of a present client, or whose interests are adverse to those of a former client on a matter that is the same or substantially related to the previous matter." *United States v. Gallegos,* 39 F.3d 276, 279 (10th Cir.1994) (summarizing New Mexico's disciplinary rules regarding conflict of interest); *accord* Rule 16-107(A) and (B).

*Id.* At 468. Lawyers have a duty to their clients to avoid conflicts of interest. *In re Montoya*, 236 P.3d 11, 17 (N.M. 2011). The determination whether a conflict of interest exists is an objective standard. *In re Sheehan*, 130 N.M. 485, 487 (S. Ct. 2001). "Careful analysis and erring on the side of caution in these situations is recommended." *Id*. A "conflict of interest exists where there is active competition between two interests, in which one interest can only be served at the expense of the other." *In re First State Bancorporation*, 2013 WL 823414, at *8 (Bankr. D.N.M.).

Here, if the Trustee believes, or feels compelled to assert, that Butler's claim against the estate has been paid in full, then the estate and Butler would have an unwaivable conflict of interest. Payment of Butler's claim would mean that most estate claims had been satisfied, so the Trustee likely could settle the appeal for a modest sum, pay the remaining claims in full, and close the case. Butler would take at $300,000 "haircut" while all other estate creditors got paid in full. Butler would fight this result tooth and nail, so the alignment of interests created by the Pooling Agreement would be destroyed.

C. <u>Interpreting the Pooling Agreement</u>.

The outcome of the dispute hinges on the correct interpretation of the Pooling Agreement. Ferguson argues that, while the agreement required Butler to "pool" the Judgment Payment, his claim has nevertheless been paid in full, and must be treated as such by the Trustee. In essence, Ferguson asserts that the Pooling Agreement was a bad deal for Butler, but one he is stuck with. Under Ferguson's reading of the Pooling Agreement, Butler's unanticipated loss of nearly $300,000 is Ferguson's unintended gain of the same amount.

As outlined above, the Trustee disagrees. He contends that under the Pooling Agreement, he is required to treat Butler's claim as paid by the Pooled Funds Distribution, not the Judgment Payment. The Trustee (and Butler) acknowledge that Ferguson's judgment debt to Butler has been reduced by the Judgment Payment amount. The question is whether the same is true of Butler's claim against the Motiva estate, given the Pooling Agreement.

Neither Ferguson nor the Trustee offered evidence to assist the Court in interpreting the Pooling Agreement.

D. <u>The Language of the Pooling Agreement</u>.

If contract language has a plain meaning, it should be applied. *Heimann v. Kinder-Morgan CO2 Co., L.P.*, 140 N.M. 552, 557 (Ct. App. 2006), citing *McMillan v. Allstate Indemnity Co.*, 135 N.M. 17, 21 (S. Ct. 2004). While the Pooling Agreement could be clearer on the issue before the Court, paragraphs e and f are instructive:

> e. To the extent the claims pursued by Butler or the Claims being pursued on behalf of the estate result in funds being received, they shall be distributed as follows: First, payment of approved fees, costs and tax to special counsel; then second *Butler will receive $35,000*; then third the Trustee for the benefit of the Estate will receive $15,000; then fourth *70% of additional funds received to Butler* and 30% of additional funds received to the Trustee for the benefit of the Estate; then finally, *to the extent funds remain after payment of all allowed estate claims*, 100% of funds received to the equity holders of the Debtor.
>
> f. Butler will be entitled to a distribution from the estate (to the extent funds remain after paying administrative expenses and payment of priority claims), but Butler's claim shall be reduced *by the funds he has received, e.g. the $35,000 plus 70% of the funds he would receive*.

(italics added). These paragraphs make clear that Butler's claim is reduced by distributions from the pooled funds, rather than by the funds Butler collects. This interpretation, which is the Trustee's, is implicit in paragraph e and explicit in paragraph f. In contrast, these paragraphs cannot be read as Ferguson would like to read them. Nowhere does the language state or imply that, *inter se*, the Trustee must treat Butler's claim as having been "zeroed out" by the Judgment Payment.

E.     The "Principal Purpose" Rule of Contract Interpretation.

Under New Mexico law, if there is an ambiguity in a contract and the parties do not offer evidence of either the circumstances surrounding the agreement or the course of conduct or course of performance of the contract, the court may resolve the ambiguity "as a matter of law by interpreting the contract using accepted canons of contract construction and traditional rules of grammar and punctuation." *Bachmann v. Regents of University of New Mexico*, 496 P.3d 604, 609 (N.M. App. 2021), quoting *Mark V. Inc. v. Mellkas*, 114 N.M. 778, 782 (S. Ct. 1993)

One accepted canon of contract construction is the "principal purpose" canon. "Words and other conduct are interpreted in the light of all the circumstances, and if the principal purpose of the parties is ascertainable it is given great weight." Restatement (Second) of Contracts, § 202 (1981); *see also Enduro Operating LLC v. Echo Production, Inc.*, 413 P. 3d 866, 869 (N.M. 2018) (quoting this section of the Restatement). The principal purpose of the Pooling Agreement is readily ascertainable: it was intended to align the Trustee's and Butler's interests in order to maximize the recovery from Ferguson for the benefit of the estate. The Trustee's interpretation of the Pooling Agreement, i.e., to reduce Butler's claim by payments *from* the pooled funds, rather than amounts he collected and gave *to* the pool, is consistent with this purpose, as it allows the maximum permissible recovery. Ferguson's interpretation, on the other hand, is inconsistent with the parties' principal purpose in signing the Pooling Agreement; it would reduce estate collections by $300,000.

F.   The "Reasonable Interpretation" Rule of Contract Construction.

"In construing a contract, the law favors a reasonable rather than unreasonable interpretation." *L.D. Miller Construction v. Kirschenbaum*, 392 P.3d 194, 199 (N.M. App. 2016) (quoting *State ex rel. Udall v. Colonial Penn Ins. Co.*, 112 N.M. 123, 130 (S. Ct. 1991)); *see also Alldredge v. Alldredge*, 151 P. 311, 313 (N.M. 1915) (like contracts, stipulations should be given a reasonable construction, with a view to effect the intent of the parties). The Trustee's interpretation is reasonable. It gives the parties the benefit of their bargain and does not result in an unintended loss (Butler) or gain (Ferguson). The Trustee's interpretation does not increase Ferguson's potential liability to the estate, because the money Butler collected that he did not keep was used to pay other estate creditors. Ferguson's interpretation, on the other hand, gives him a $300,000 windfall and Butler a $300,000 loss. That is not reasonable.

G. *The Trustee's Interpretation of the Pooling Agreement is Fair to Creditors and Ferguson*.

The Trustee's interpretation of the Pooling Agreement does not prejudice estate creditors or Ferguson. No reasonable creditor would have understood the Pooling Agreement to require that Butler's claim be treated as paid by the amounts he collected, even though he had to turn all collections over to the estate. Instead, a reasonable creditor would agree with the Trustee's interpretation, and would have supported the Pooling Agreement for the reasons outlined above.

Similarly, the Trustee's interpretation treats Ferguson fairly. Ferguson's obligations to Butler and the Trustee are not increased, as the portion of the Judgment Payment Butler did not end up with went to pay other estate claims. Under the adversary proceeding judgment on appeal, Ferguson is liable for those claims. Thus, while he realizes no benefit, Ferguson suffers no disadvantage. If the appellate courts uphold the Trustee's judgment against Ferguson, then he will have to answer it until all estate claims are paid in full. That is not Ferguson's preferred result, but it cannot be considered unfair. Butler would then be paid, and be allowed to keep, 100% of his judgment, but no more.

In sum, the Court adopts the Trustee's interpretation of the Pooling Agreement as reasonable and consistent with the agreement's language and principal purpose.

H. *Under the Court's Interpretation of the Pooling Agreement, There is no Conflict of Interest*.

Based on the Court's interpretation of the Pooling Agreement, the Trustee cannot take the position that Butler's claim was paid by the Judgment Payment. Instead, the Trustee must treat Butler's claim as paid only by the Pooled Funds Distribution and other amounts received under the Pooling Agreement. Just as Butler would have breached the Pooling Agreement by keeping the Judgment Payment, the Trustee would breach it by contending that the Judgment Payment extinguished Butler's claim.

Ferguson's conflict of interest argument is based entirely on his interpretation of the Pooling Agreement. As shown above, that interpretation is wrong. There is, therefore, no conflict of interest. The interests of the parties are still aligned.

<u>Conclusion</u>

Ferguson's motion for a ruling that an actual conflict of interest exists requiring the estate to obtain new counsel in the adversary proceeding is not well taken and will be denied by separate order.

                                           Hon. David T. Thuma
                                           United States Bankruptcy Judge

Entered: May 26, 2023
Copies to: counsel of record