

**IT IS ORDERED**

**Date Entered on Docket: 10/22/2025**

_____
**The Honorable Sarah A. Hall**
**United States Bankruptcy Judge**

---

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW MEXICO

In re:

MOTIVA PERFORMANCE
ENGINEERING, LLC,                                   Case No. 19-12539-sh7

          Debtor.

## **<u>OPINION</u>**

On September 16, 2025, the following matters came on for hearing before the Court:

1. Interest Owner's Motion to Determine Amount of Creditor Creig Butler's Claim and Make Final Distribution to Creditors and Interest Owners [Doc. 244], filed by William S. Ferguson ("Ferguson") on April 14, 2025 (the "Ferguson Motion");

2. Objection to Motion to Determine that Butler Judgment has been Satisfied in Full and Response to Request for Distribution [Doc. 251], filed by Creig Butler ("Butler") on May 15, 2025;

3. Limited Response to Interest Owner's Motion to Determine Amount of Creditor Creig Butler's Claim and Make Final Distribution to Creditors and Interest Owners [Doc. 252], filed by Philip Montoya, the chapter 7 trustee ("Trustee") on May 15, 2025;

4. Motion for Interim Distribution from Court Registry; and Motion to Authorize Trustee's Interim Distribution to Creig Butler [Doc. 250], filed by Trustee for the bankruptcy estate of Motiva Performance Engineering, LLC ("Motiva"), and Butler on May 15, 2025 (the "Joint Motion"); and

5. Interest Owner's Objection to Motion for Interim Distribution (Doc. 250) [Doc. 262], filed by Ferguson on June 24, 2025.

The Ferguson Motion and the Joint Motion (collectively, the "Motions") both have the same goal of immediate distribution of the Motiva bankruptcy estate, either in whole or in part. However, the proposed distributions differ significantly. Ferguson seeks, first, a determination Butler's claim has been paid in full and, second, for Trustee to distribute estate assets in full with any remaining distributions after payment of administrative claims and unsecured claims being distributed to interest holders including Ferguson.

In contrast, Trustee and Butler seek approval of distribution from the Court registry of appeal bond proceeds and then distribution of a significant portion of the total cash then on hand to pay approved post-petition administrative expenses of the Modrall Firm (defined below) with the remaining cash on hand then distributed to Trustee and Butler in accordance with the Pooling Agreement.

This is not the first and undoubtedly will not be the last dispute between the parties. Even a cursory review of this bankruptcy case and related matters evidences Ferguson, Trustee, and Butler cannot agree on virtually anything and consistently require the expenditure of fees, expenses, and time to resolve their disputes. Such actions have diminished, and will continue to diminish, the estate assets ultimately available for distribution.

## **BACKGROUND**

The Court does not consider the issues raised by the Motions without reference to all the matters previously decided by the Court prior to the undersigned being assigned to this case and related adversary proceedings.[1] This bankruptcy case has a long and tortured history which is

---

[1] The Honorable David T. Thuma presided over this bankruptcy case and related adversary proceedings from its commencement until his untimely death on May 8, 2025. The undersigned

2

necessary to understand the how, when, and why the issues raised by the Motions arose and to determine the appropriate relief to be granted. In short, Ferguson created a tangled web of legal and other machinations in an effort to avoid paying Butler and/or losing valuable assets in both New Mexico state courts and this Court. Fortunately for the Court, those facts have, for the most part, been established by prior final decisions of this Court.

As stated on the record during the hearing, given the tortuous and lengthy history of Motiva, Ferguson, and Butler which necessarily impacted, and continues to impact, the administration of the Motiva bankruptcy estate, the Court is hesitant to authorize any interim distribution given the uncertainty over what will be required of Trustee to conclude this bankruptcy case and the parties to conclude the State Court litigation.

## JURISDICTION

The Court has jurisdiction to hear these contested matters pursuant to 28 U.S.C. § 1334(a), and venue is proper pursuant to 28 U.S.C. § 1409. Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a), and this is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(A).

## FINDINGS OF FACTS

The underlying facts for these contested matters have, for the most part, been previously established by this Court and appellate courts.

> Whether the "law of the case" doctrine applies to questions of fact . . . is unclear. See United States v. Monsisvais, 946 F.2d 114, 115 n.2 (10th Cir.1991) (declining to "address under what circumstances findings of fact become the law of the case"). Assuming for purposes of argument that the doctrine generally applies to findings of fact, a court is not bound by the doctrine if it is "convinced that [a finding] is clearly erroneous and would work a manifest injustice." Arizona v.

---

judge was then assigned to preside over this case and related adversary proceedings on May 13, 2025, by the United States Court of Appeals for the Tenth Circuit.

3

<u>California</u>, 460 U.S. 605, 618 n. 8, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983).

<u>Johnson v. Champion</u>, 288 F.3d 1215, 1226 (10th Cir. 2002). The Tenth Circuit has not addressed under what circumstances findings of fact become law of the case. <u>S-Tek 1, LLC v. Surv-Tek, Inc.</u> (<u>In re S-Tek 1, LLC</u>), 650 B.R. 716, 731 n.61 (Bankr. D. N.M. 2023) (citing <u>Monsisvais</u>, 946 F.2d at 115 n.2). This Court (Judge Jacobvitz) previously held "it is appropriate to apply law of the case to the findings of this Court made following a trial on the merits, resulting in entry of a final judgment. Consequently, it is appropriate to bind the parties to this litigation to the Court's prior findings of fact." <u>S-Tek 1, LLC</u>, 650 B.R. at 731 n.61. Law of the case applies to "subsequent rulings by the same judge in the same case or a closely related one [and] to rulings by different judges at the same level." <u>LNV Corp. v. Ad Hoc Group of Second Lien Creditors</u> (<u>In re La Paloma Generating Co. LLC</u>), 2020 WL 224569, at *3 (Bankr. D. Del. 2020) (citing <u>In re Radnor Holdings Corporation</u>, 564 B.R. 467, 482 (Bankr. D. Del. 2017) (citing <u>Casey v. Planned Parenthood</u>, 14 F.3d 848, 856 (3d Cir. 1994))).

Consequently, the relevant facts,[2] derived, in part, from prior, final decisions of this Court and appellate courts, and from the hearing evidence, are:[3]

1. Ferguson is a well-known local attorney. Ferguson was majority owner and sole manager of Motiva, which made high profile performance modifications to its customers' cars.

---

[2] Some of the Court's findings are in the discussion section of the opinion. They are incorporated by this reference.

[3] The Court specifically notes the facts exceed the evidence presented during the hearing but are necessary to fully understand the risks to the bankruptcy estate through a complete or nearly complete distribution at this point in time.

Opinion [Doc. 105 in Adv. 21-1026], entered on October 7, 2022 (the "Adversary Opinion"), pp. 2-3 (Joint Ex. 6).[4]

2. Over the years, Ferguson was the only source of capital for Motiva. Adversary Opinion, p. 4 (Joint Ex. 6).

3. Unless Ferguson's loans to Motiva are characterized as equity investments, which would be contrary to Motiva's bankruptcy schedules reflecting Ferguson as a creditor for amounts loaned thereto, Motiva was never solvent and was, in fact, substantially insolvent throughout its life. Adversary Opinion, pp. 4-5 (Joint Ex. 6).

4. Ferguson also owns several other businesses, including Dealerbank Financial Services, Ltd., Armageddon High Performance Solutions, Armageddon Tool & Die, and Avatar Recoveries (together, the "Ferguson Affiliates"). Avatar Recoveries owned the building leased to Motiva. Adversary Opinion, pp. 2, 6 (Joint Ex. 6).

5. In 2014, Butler hired Motiva to upgrade a 2009 Hummer H3TX (the "Hummer"). The work did not go well, and Butler sued Motiva on February 28, 2017, in the Second Judicial District, State of New Mexico (the "State Court"), No. D-202-CV-2017-01393 (the "State Court Action"). In his complaint in the State Court Action, Butler alleged Motiva agreed to upgrade the Hummer for $20,000, but two years and $70,000 later, the Hummer was unsafe to drive and good only for parts. Adversary Opinion, p. 9 (Joint Ex. 6).

6. On October 26, 2018, after a four-day trial in the State Court Action, a jury returned a verdict against Motiva for $292,001 plus costs, attorney fees, and post-judgment interest.

---

[4] The Court takes judicial notice of the docket in this case. St. Louis Baptist Temple, Inc. v. Fed. Deposit Ins. Corp., 605 F.2d 1169, 1172 (10th Cir. 1979) (a court may *sua spo*nte take judicial notice of its docket and of facts that are part of public records).

The judgment was increased to $337,318 on April 3, 2019, to include additional attorney fees and costs (collectively, the "Butler Judgment"). Butler Judgment (Joint Ex. 1); Adversary Opinion, pp. 9-10 (Joint Ex. 6).

7. On November 26, 2018, the State Court issued a writ of execution, directing the sheriff to levy Motiva's property to satisfy the Butler Judgment. On December 5, 2018, the writ was served by a deputy sheriff who prepared to levy Motiva's property. The deputy observed about 50 boxed "pipe kits." Ferguson intervened, telling the deputy the pipe kits belonged to Motiva and were subject to Avatar Recoveries' landlord's lien but later claimed another related affiliate owned the pipe kits. Adversary Opinion, p. 11 (Joint Ex. 6).

8. Butler then sought a preliminary injunction from the State Court freezing Motiva's assets, including a 2012 Ferrari FF (the "Ferrari") and $40,948 in insurance proceeds for damage to the Ferrari. Motiva and other Ferguson entities, represented by Ferguson, disagreed and argued Ferguson owned the Ferrari and an affiliate owned the pipe kits. Adversary Opinion, pp. 9, 11 (Joint Ex. 6). On October 28, 2019, the State Court, after hearing, ruled Motiva owned the Ferrari, the pipe kits and the insurance proceeds. Adversary Opinion, p. 11 (Joint Ex. 6).

9. Ferguson also transferred cars titled in Motiva "with no money changing hands." Adversary Opinion, p. 10 (Joint Ex. 6).

10. The State Court was not pleased with Ferguson or his affiliates for transferring the Ferrari to Dealerbank, encumbering the Ferrari after a preliminary injunction hearing designed to stop Motiva and Ferguson from transferring or encumbering, and taking the inconsistent positions regarding ownership of the Ferrari and the pipe kits. Consequently, the State

6

Court entered an order of civil contempt, containing extensive findings of fact and
conclusions of law.[5]  Adversary Opinion, p. 12 (Joint Ex. 6).

11. Motiva filed a voluntary chapter 11 bankruptcy petition on November 1, 2019 (the
"Petition Date").  Doc. 1.

12.  Motiva's chapter 11 bankruptcy case was converted to chapter 7 on April 15, 2020, and
Trustee was appointed the chapter 7 trustee.  Docs. 69 and 70.

13. On April 12, 2020, Butler filed a Proof of Claim [Claim No. 3-1] in the Bankruptcy Case
in the amount of $461,083.53 as of the Petition Date, with interest thereafter at 15% (the
"Butler Claim").  The Butler Claim is based on the Butler Judgment in the State Court
Action and asserts it is secured, in part, by the Ferrari, inventory of the pipe kits, and
$40,948.49 in cash collateral.  Butler Claim (Joint Ex. 2).

14. In January 2021, Trustee struck a compromise with Butler settling several disputes Butler
had with the estate.  The terms of the settlement are (collectively, the "Pooling
Agreement"):

    a.  Butler will waive and release his alleged secured claim on funds [sic]
        approximately $50,000.00 in funds arising out of the Ferguson
        Compromise Application and on any future recovery by Trustee, including
        the Estate's portion of the proceeds to be recovered under the terms of this
        agreement, if the Application is granted.

    b.  Trustee shall pursue the claims of the estate against the affiliates and
        insiders of Motiva, including, without limitation, the claims in the
        adversary Proceeding, fraudulent transfer claims, breach of fiduciary duty
        claims, and alter ego claims ("Claims").  Butler shall pursue all claims he
        has against the same parties.  Any and all recovery on the Estate's Claims
        and Butler's claims, will be pooled.  This pooling does not include claims

---

[5] The New Mexico Supreme Court later censured Ferguson, suspended him from the practice
of law for 90 days, and required him to take a professional responsibility examination based on
his inconsistent positions regarding ownership of the Ferrari.  Adversary Opinion, p. 13 (Joint
Ex. 6).

of the Estate against third parties other than Ferguson, the entities Ferguson controls, and insiders of Motiva (although none are known at this time).

c. Trustee will file an application to hire the Modrall Sperling Law Firm as special counsel to pursue the Claims.

d. Butler and Trustee may pursue some of the Claims, and Butler's companion claims, as joint plaintiffs or separately in different matters. Butler shall be granted relief from any stays or injunctions to pursue his separate claims hereunder.

e. To the extent the claims pursued by Butler or the Claims being pursued on behalf of the estate result in funds being received, they shall be distributed as follows: First, payment of approved fees, costs and tax to special counsel; then second Butler will receive $35,000; then third Trustee for the benefit of the Estate will receive $15,000; then fourth 70% of additional funds received to Butler and 30% of additional funds received to Trustee for the benefit of the Estate; then finally, to the extent funds remain after payment of all allowed estate claims, 100% of funds received to the equity holders of Motiva.

f. Butler will be entitled to a distribution from the estate (to the extent funds remain after paying administrative expenses and payment of priority claims), but Butler's claim shall be reduced by the funds he has received, e.g. the $35,000.00 plus 70% of funds he would receive.

Chapter 7 Trustee's Motion to Approve Compromise with Creig Butler [Doc. 124] (Joint Ex. 3) (the "Butler Settlement Motion").

15. Ferguson filed the only objection to the Butler Settlement Motion, arguing (i) Butler's interests were not aligned with Trustee's interests and (ii) the Pooling Agreement was not fair to unsecured creditors. Doc. 158 (Joint Ex. 5).

16. On June 4, 2021, the Court approved the Butler Settlement Motion and the Pooling Agreement over Ferguson's objection. Opinion [Doc. 158] (Joint Ex. 5). Ferguson did not appeal. Docket generally.

17. Pursuant to the approved Pooling Agreement, the Court thereafter entered an order approving the Trustee's employment of Modrall, Sperling, Roehl, Harris, & Sisk, P.A. (the "Modrall Firm")[6] as special counsel on June 22, 2021. Order Approving Employment of Modrall Sperling Law Firm as Special Counsel for Chapter 7 Trustee [Doc. 162], filed on June 22, 2021.

18. Trustee, through its special counsel, the Modrall Firm, then sued Ferguson and the Ferguson Affiliates in September 2021 in Adversary Proceeding No. 21-1026, asserting eight claims (the "Trustee Adversary Proceeding"). Doc. 1 in Adv. No. 21-1026.

19. The Trustee Adversary Proceeding was tried in August 2022, and the Court's Adversary Opinion and Judgment were entered on October 7, 2022. Docs. 105 and 106 in Adv. No. 21-1026 (collectively, the "Trustee Judgment") (Joint Exs. 6 and 7). The Trustee Judgment granted Trustee substantial money judgments against, among others, Ferguson and specifically holds Ferguson personally liable for all valid prepetition debts of Motiva, reserving judgment on whether Ferguson is also liable for allowed administrative expenses incurred in this case. Trustee Judgment [Doc. 105 in Adv. No. 21-1026], pp. 1-2 and 34 (Joint Ex. 6 as amended by Joint Ex. 11).[7]

20. Beginning in late November, 2022, after entry of the Trustee Judgment, communications began regarding a representation Ferguson made in a reply brief respecting his motion to

---

[6] The Modrall Firm had represented Butler in the State Court Action and the bankruptcy case and continued to represent Butler. (Joint Ex. 2, Part 2); Docket Sheet.

[7] Ferguson, among others, appealed the Trustee Judgment, and both the Bankruptcy Appellate Panel for the Tenth Circuit and the Tenth Circuit affirmed.[7] Docs. 149, 157, entry date February 13, 2024, and Doc. 160 in the Trustee Adversary. Ferguson sought and obtained a stay pending appeal and was required to post an appeal bond in the amount of $810,000, and Ferguson satisfied this requirement by depositing $810,000 into the Court's registry (the "Appeal Bond"). Docs. 137 and 140 in Trustee Adversary.

stay and set an appeal bond relating to the Trustee Judgment, specifically that Ferguson would pay the full amount of the Butler Judgment. Ferguson Exs. 1-7.

21. As presented by Ferguson, only three of the emails between Ferguson's counsel and the Modrall Firm regarding payment of the Butler Judgment possibly suggest such payment would result in full satisfaction of the Butler Claim notwithstanding the approved Pooling Agreement but they are far from evidencing a meeting of the minds regarding such treatment.[8] Ferguson Exs. 1-7.

22. In contrast, Trustee and Butler provided an email dated November 18, 2022, sent by the Modrall Firm in response to the email sent by Ferguson's counsel on November 17, 2022, transmitting a draft Satisfaction of Judgment. (Joint Ex. 8; Ferguson Ex. 3). The Modrall Firm rejected it as unacceptable to Butler for multiple reasons.[9] (Joint Ex. 8). Ferguson's presentation of the negotiations leading up to the payment through Ferguson Exs. 1-7 was misleading.

23. During these discussions, on November 29, 2022, and prior to the payment, Ferguson, among others, filed two disclaimers releasing Trustee from any obligation (i) to the

---

[8] Specifically, Ferguson Ex. 3, dated November 17, 2022, simply states, "Let me know if you approve these forms," and the form satisfaction of judgment is attached. Ferguson Ex. 4, dated November 23, 2022, apologizes for Ferguson's counsel's delay in getting back to the Modrall Firm, transmits another "stab at it" not yet approved by Ferguson (but fails to include the attachment), and advises he has calculated interest up to the next Friday. Ferguson Ex. 5, an email from Ferguson's counsel, states he is prepared to tender funds to satisfy the Butler Judgment.

[9] Butler's stated reason for rejecting the Full Satisfaction of Judgment was simple – the proposed payment did not satisfy all of Butler's liability arising in the State Court Action. While Butler would be obligated to file a partial release of judgment upon receipt of any funds from Ferguson, Butler did not consider the proposed payment to be in full satisfaction of the State Court Judgment as the sanctions award therein would not be paid and interest continued to accrue and attorney fees continued to be incurred. (Joint Ex. 8).

"Equity Owners to collect funds which would result in a distribution to Equity Owners" and (ii) to the "Insider Creditors to collect funds which would result in distribution to the Insider Creditors" (the "Disclaimers").  Docs. 204 and 205, respectively.  Ferguson individually signed the Disclaimers as an Equity Owner and Insider Creditor.  Docs. 204 and 205.[10]

24. The discussions concluded in Ferguson's counsel wiring $491,547.20 to the Modrall Firm's trust account on December 1, 2022 (the "Wire").  Doc. 224 (Joint Ex. 14); Ferguson Ex. 7.   The Wire was made to the Modrall Firm's trust account at a time when such firm represented not only Butler but Trustee.  Doc. 162.

25. In accordance with the Pooling Agreement, Butler delivered the proceeds of the Wire to Trustee.  On December 9, 2022, Trustee filed a report of receipt of funds and notice of distribution, stating:

> Trustee reports having received the following amounts: $3,530.00 from Armageddon Tool & Die and $491,547.20 from the Ferguson parties for a total of $495,077.20.
>
> Pursuant to the terms of the Court Order approving the Settlement Motion, the Trustee shall distribute the following amounts: (a) Approved fees and costs of Modrall Sperling ("Special Counsel") in the amount of $218,765.27; (b) 70% of net recovery in the amount of $193,418.35 [the "Pooled Funds Recovery"] to creditor Creig Butler payable as follows:  "Modrall Sperling in Trust for Creig Butler" and (c) 30% of the recovery shall [be] retained for the Estate in the amount of $82,893.58.
>
> Special Counsel understands and has agreed that any future fees and expenses approved by this Court will be paid from additional recoveries (if any), and not from the amounts retained by the Estate herein.
>
> Doc. 207.

---

[10] The basis for the Disclaimers was the Equity Owners and Insider Creditors did not believe collection of the Trustee Judgment was "appropriate" and did not want Trustee to pursue collection thereof for distribution to Equity Owners and Insider Creditors.  Docs. 204 and 205.

26. On February 27, 2023, Trustee filed a motion to clarify the Modrall Firm's employment as special counsel for Trustee included its work on the appeal of the Trustee Judgment (the "Clarification Motion").  Doc. 211.

27. Ferguson was the only party objecting to the Clarification Motion (the "Clarification Objection ").  Doc. 214 (Joint Ex. 12).  Ferguson argued the Clarification Motion should be denied because an actual conflict of interest had arisen between Trustee and Butler, requiring Trustee to retain new counsel.  Doc. 214 (Joint Ex. 12).

28. Per the Clarification Objection, the alleged conflict was, given the Modrall Firm's receipt of the Wire, Butler's claim in the Bankruptcy Case was paid in full.  Ferguson argued, because Butler disagreed with that position and contended his claim was only reduced by the distribution received per Doc. 207 rather than the full $491,547.20 received by the Modrall Firm from Ferguson, there is an actual conflict between the parties to the tune of $298,129.  Doc. 214 (Joint Ex. 12).

29. The Court granted the Clarification Motion, allowing the Modrall Firm to continue to represent Trustee in the appeal.  However, the Court treated Ferguson's conflict of interest argument as a separate motion, i.e. seeking a ruling a disqualifying conflict had arisen, and took such issue under advisement.  Doc. 225 (Joint Ex. 15); Doc. 224 (Joint Ex. 14).

30. The Court issued an Opinion [Doc. 224] (Joint Ex. 14) on May 26, 2023, addressing whether an actual conflict of interest arose between Butler and the Motiva bankruptcy estate and concluded no conflict existed.  In the Opinion, the Court interpreted the Pooling Agreement based on its plain language:

> While the Pooling Agreement "could be clearer", paragraph e. and f. are instructive:

e. To the extent the claims pursued by Butler or the Claims being pursued on behalf of the estate result in funds being received, they shall be distributed as follows: First, payment of approved fees, costs and tax to special counsel; then second *Butler will receive $35,000*; then third the Trustee for the benefit of the Estate will receive $15,000; then fourth *70% of additional funds received to Butler* and 30% of additional funds received to the Trustee for the benefit of the Estate; then finally, *to the extent funds remain after payment of all allowed estate claims*, 100% of funds received to the equity holders of the Debtor.

f. Butler will be entitled to a distribution from the estate (to the extent funds remain after paying administrative expenses and payment of priority claims), but Butler's claim shall be reduced *by the funds he has received, e.g. the $35,000 plus 70% of the funds he would receive.*

These paragraphs make clear that Butler's claim is reduced by distributions from the pooled funds, rather than by the funds Butler collects.

Doc. 224, p. 10 (Joint Ex. 14). The Court found paragraphs e. and f. simply do not suggest Butler's claim is satisfied by Ferguson's payment of the Butler Judgment and must be treated as "being zeroed out." Doc. 224, p. 10 (Joint Ex. 14). Rather, "Trustee's interpretation of the Pooling Agreement, i.e., to reduce Butler's claim by payments *from* the pooled funds, rather than amounts he collected and gave to the pool, is consistent with this purpose,[11] as it allows the maximum permissible recovery." Opinion, pp. 10-11 (Joint Ex. 14). Judge Thuma rejected Ferguson's interpretation, in part, because such interpretation would create a $300,000 windfall to Ferguson while causing Butler to suffer a corresponding loss, which Judge Thuma concluded was an unreasonable interpretation of the Pooling Agreement. Doc. 224, pp. 11 and 13 (Joint Ex. 14).

---

[11] The Court found the purpose of the Pooling Agreement was to align Trustee's and Butler's interests in an effort to maximize recovery from Ferguson for the benefit of the bankruptcy estate. Doc. 224, p. 11 (Joint Ex. 14).

31. Because Ferguson's conflict argument was based entirely on his interpretation of the Pooling Agreement, which the Court expressly rejected, no conflict of interest arose as a result of the Modrall Firm's representation of both Butler and Trustee.   Doc. 224, p. 13 (Joint Ex. 14).

32. Now, Trustee, Butler, and Ferguson have filed the Motions seeking a distribution of estate funds on hand (per Trustee $920,462.82).  Doc. 244 and 250.  Trustee also seeks a release of the Appeal Bond from the Court registry while Ferguson further seeks a determination the Butler Claim has been paid in full.  Doc. 244 and 250.

## CONCLUSIONS OF LAW

> Principles of equity underlie the entire bankruptcy process.  Thus, it comes as no surprise that a bankruptcy court would invoke such principles in adjudicating a matter when a pattern of playing fast and loose with the truth manifests.  After many years of gamesmanship to benefit financially, the appellants [including Ferguson] found themselves facing the consequences of their choices when a related debtor-entity filed bankruptcy.

Montoya v. Ferguson (In re Motiva Performance Engineering, LLC), 2024 WL 243622, at *1 (10th Cir. BAP Jan. 23, 2024).  This quote provides the perfect backdrop to the issues before this Court.  Ferguson has repeatedly angled for economic advantage before and during this bankruptcy case from this Court and the State Court.  His fast and loose wrangling of facts and law have been unsuccessful at every turn.  The Court views his current efforts to have the Butler Claim determined to be paid in full and to force Trustee to make an immediate and full distribution of bankruptcy estate assets to creditors and interest holders, including Ferguson himself, as one more effort to obtain an economic advantage at Butler's expense, which runs counter to the Bankruptcy Code and this Court's prior rulings.

## I.     **THE BUTLER CLAIM HAS NOT BEEN PAID IN FULL**.

Before the Court can address whether Trustee must or may make an interim or a final distribution, the Court must first determine whether the Butler Claim has been paid in full. This requires an analysis of the Pooling Agreement between Trustee and Butler. (Docs. 124, 130, 158, and 159). Ferguson objected to the Pooling Agreement on three separate grounds, specifically: (i) the interests between Trustee and Butler are not aligned giving rise to a conflict of interest in the Modrall Firm's joint representation of Trustee and Butler; (ii) the settlement ignores the distribution priority of the Bankruptcy Code; and (iii) the settlement is not in the best interest of the estate as it provides a disproportionate share of any proceeds to Butler.

In pertinent part, the Pooling Agreement between Trustee and Butler can be summarized as follows:

   a.   Butler waives and releases his alleged secured claim on approximately $50,000.00 in funds arising out of Trustee's settlement with Ferguson and on any future recovery by Trustee, including monies received by the estate pursuant to the Pooling Agreement.

   b.   Trustee will pursue the claims of the estate against the Motiva affiliates and insiders, including, without limitation, the claims in the Adversary Proceeding, and Butler shall pursue all claims he has against the same parties (collectively, the "Claims"). **Any and all recovery on the estate's and Butler's Claims, will be pooled.**

   c.   Trustee will file an application to hire the Modrall Firm as special counsel to pursue the Claims.

   d.   To the extent the Claims pursued by Butler or on behalf of the estate result in funds being received, they will be distributed as follows: First, to payment of approved fees, costs and tax to the Modrall Firm; second $35,000 to Butler; third, $15,000 to Trustee for the benefit of the estate; then fourth 70% of any additional funds received by the estate to Butler and 30% of such funds to Trustee for the benefit of the estate; and finally, to the extent funds remain after payment of all allowed estate claims, 100% of funds received to the Motiva equity holders.

     e.      Butler will be entitled to a distribution from the estate but Butler's claim shall be reduced by the funds he has received, e.g. the $35,000. plus 70% of funds he will receive from the estate.

Doc. 124 (Joint Ex. 3); Doc. 158 (Joint Ex. 5).

Settlements are favored in bankruptcy.  Korngold v. Loyd (In re Southern Med. Arts Cos., Inc.), 343 B.R. 250, 255 (10th Cir. 2006).  "The purpose and effect of seeking court approval of a compromise under Rule 9019 is to bind the bankruptcy estate to the terms of any bargain struck by a trustee or debtor-in possession that affects the bankruptcy estate."  In re Hall, No. 06-40872, 2010 WL 1730684, at *8 (Bankr. D. Kan. Apr. 28, 2010) (citing In re OptinRealBig.com, LLC, 345 B.R. 277, 291 (Bankr. D. Colo. 2006)).  Bankruptcy Rule 9019 protects creditors of a bankruptcy estate from economically disadvantageous compromise agreements by a trustee that may affect a creditor's ability to realize a distribution on its claim.  In re Git-N-Go, Inc., 322 B.R. 164, 175 n.12 (Bankr. N.D. Okla. 2004) (citing In re Blehm Land & Cattle Co., 859 F.2d 137, 140 (10th Cir. 1988)).

The general rules of contract interpretation under applicable state law apply to settlement agreements.  Flying J Inc. v. Comdata Network, Inc., 405 F.3d 821, 832 (10th Cir. 2005).  "Courts are to deduce the 'purpose, meaning and intent of the parties to a contract' from 'the language employed by them,' and 'where such language is not ambiguous, it is conclusive.'"  Belgravia Hartford Gold Assets Corp. v. PolyNatura Corp., 765 F. Supp. 3d 1215, 1223 (D. N.M. 2025), reconsideration denied, No. 2:21-CV-00918-MIS-JHR, 2025 WL 2306834 (D.N.M. Aug. 11, 2025) (citing ConocoPhillips Co. v. Lyons, 299 P.3d 844, 852 (N.M. 2012) (quoting Cont'l Potash, Inc. v. Freeport-McMoran, Inc., 115 N.M. 690, 858 P.2d 66, 80 (1993))).  A contract term is ambiguous if it is reasonably and fairly susceptible to several different constructions.

<u>Belgravia Hartford</u>, 65 F.Supp.3d at 1223 (quoting <u>Mark V, Inc. v. Mellekas</u>, 114 N.M. 778, 845 P.2d 1232, 1235 (1993)).

The Court does not find the Pooling Agreement susceptible to different constructions and finds it is, therefore, not ambiguous.  The Pooling Agreement requires Trustee and Butler to pursue their respective claims against, among others, Ferguson, and to "pool" their recoveries. Doc. 124, p. 4, ¶ b (Joint Ex. 3).  In conjunction with this agreement to pool recoveries, the Pooling Agreement also clearly provides the Butler Claim is reduced by funds Butler receives under the Pooling Agreement rather than by recoveries he receives from Ferguson or other sources which must be turned over to Trustee thereunder.  The Pooling Agreement also sets forth a distribution priority if "claims pursued by Butler or the Claims being pursued on behalf of the estate result in funds being received":

> First to approved fees, costs, and tax to the Modrall Firm
>
> Second $35,000 to Butler
>
> Third $15,000 to Trustee for the bankruptcy estate
>
> Fourth, with respect to additional funds received and required to be pooled under the Pooling Agreement, then 70% of such additional funds to Butler and 30% to Trustee for the bankruptcy estate
>
> Fifth, after payment of all allowed estate claims, 100% of remaining funds, if any, to Motiva equity security holders.

Doc. 124, p. 5, ¶ e. (Joint Ex. 3).  Subparagraph f. then illustrates this agreed upon distribution scheme providing, after payment of administrative expenses and priority claims, Butler will be entitled to "the $35,000 [second distribution level] plus 70% of funds he will receive [fourth distribution level]."  Doc. 124, p. 5, ¶ f (Joint Ex. 3).  In other words, the Butler Claim is reduced not by what Butler collects on the Butler Judgment but rather by what the distribution scheme of

the Pooling Agreement (assuming the first three categories have been paid) provides: 70% of additional funds received by the bankruptcy estate – not funds received by Butler.

To suggest otherwise would result in an absurdity under the circumstances which must be avoided. Grubb v. Kempthorne, 2008 WL 5999637, at *21 (D. N.M. Aug. 25, 2008). Ferguson's interpretation of the Pooling Agreement[12] would result in Ferguson (and related entities) receiving distributions as Motiva equity interest holders even though Butler would receive less than full payment on the Butler Claim to the exclusive benefit of Ferguson and other insiders, an absurd result. "What should be clear . . . is that a Chapter 7 debtor cannot leapfrog unpaid creditors in the § 726 distribution scheme." In re Pickett, 632 B.R. 78, 83 (Bankr. E.D. Cal. 2021). "Inasmuch as equity security holders rank junior to other creditors, they cannot receive any distribution until the priority, secured and general unsecured claims are satisfied in full." Louisiana Indus. Coatings, Inc. v. Pertuit (In re Louisiana Indus. Coatings, Inc.), 31 B.R. 688, 697 (Bankr. E.D. La. 1983) (citing Northern Pacific Railway Co. v. Boyd, 228 U.S. 482, 508 n.71 (1913)). Given Butler's position throughout the extensive State Court Action and in this bankruptcy case, as well as the plain language of Section 11 U.S.C. § 726, Ferguson's interpretation of the Pooling Agreement would be an intolerable absurdity. The Court sees no other reasonable interpretation of the effect of the Pooling Agreement other than the Butler

---

[12] Importantly, Ferguson did not object to the motion approving the Pooling Agreement based on its failure to provide a dollar for dollar reduction in the Butler Claim for proceeds recovered by Butler and cannot now collaterally attack the Pooling Agreement as the order approving it is final.

Claim is only reduced by proceeds Butler receives from Trustee under the Pooling Agreement – paragraph f. cannot be interpreted otherwise.[13]

While Ferguson objected to the Pooling Agreement, the Court overruled his objections and granted the motion to approve the Pooling Agreement, finding "the compromise is a creative and fair resolution of the estate's potential disputes with Butler." Docs. 158 (Joint Ex. 5) and 159. Moreover, Ferguson did not appeal this decision. Therefore, the order approving the Pooling Agreement is a final judgment on the merits and is entitled to preclusive effect. In re Fundamental Long Term Care, Inc., 628 B.R 344, 353-54 (Bankr M.D. Fla. 2021); In re Reagor-Dykes Motors, LP, 613 B.R. 878, 887-88 (Bankr. N.D. Tex. 2020). Accordingly, the monies recovered from Ferguson and Motiva's affiliates by either Trustee or Butler are pooled.[14] Doc. 158, p. 5 (Joint Ex. 5). Given the express language of the Pooling Agreement, that recoveries by Trustee and Butler from Motiva affiliates and insiders (including Ferguson) are to be pooled to distribute according to an agreed distribution scheme, Ferguson's inconsistent interpretation is unreasonable.

Another of Ferguson's actions raises concerns. Specifically, the timing of his payment by Ferguson of the State Court Judgment, a year and a half after the Pooling Agreement was approved by the Court clearly stating the recoveries by Trustee and Butler will be pooled. The email correspondence between counsel for Ferguson and Butler clearly reflects Butler did not agree to accept the proposed payment as payment in full rather than "pooling" the payment and

---

[13] This Court previously reached this same conclusion in the Conflict Opinion. Doc. 224, p. 10 (Joint Ex. 14). However, the Court reaches its conclusion separately and independently based on the plain language of the Pooling Order, which is a final order over the objection of Ferguson.

[14] The Settlement Motion states the claims being pursued are claims against the affiliates and insiders of Motiva. (Joint Ex. 3, p. 4).

distributing it per the Pooling Agreement. Based on a review of the docket and filings in this bankruptcy case, as well as the final orders and opinions of the State Court and the respective New Mexico and federal appellate courts, the Court believes Ferguson's argument the Butler Claim must be reduced by the amount of the Wire received from Ferguson is nothing but another tactical move by Ferguson to minimize Butler's recovery and is rejected.

Finally, the Court questions whether Ferguson has standing to seek the relief requested in the Ferguson Motion or to object to the Joint Motion. In 2022, Ferguson released Trustee from any obligation to him to collect funds which would result in a distribution to him as either an equity interest holder in, or as an insider creditor of, Motiva. Docs. 204 and 205. The Disclaimers were filed November 29, 2022, a mere two days before the purported payment in full of the State Court Judgment. Docs. 204 and 205. The disclaimers of "distribution" so close to the **_voluntary_** payment of the State Court Judgment by Ferguson only serve to further the Court's suspicions the payment and the filing of the Disclaimers were nothing more than another effort to box Butler and Trustee into a position where they would be required to reduce the Butler Claim by the full amount of the Wire rather than by what Butler actually received from Trustee under the Pooling Agreement. Ferguson side-stepped those issues rather than addressing them head-on and made two, apparently unsuccessful, attempts to get a "Satisfaction of Judgment" from Butler during the days leading up to the Wire but apparently to no avail. And, no signed Satisfaction of Judgment was presented as evidence. (Ferguson Exs. 3, p. 2, and 4). Further, none of the emails between Ferguson's counsel and the Modrall Firm, in any way, conditioned the Wire upon Butler accepting it as full payment and satisfaction of the State Court Judgment. (Joint Exs. 8 and 9; Ferguson Exs. 1-7). Given Ferguson went so far as to provide two drafts of a Satisfaction of Judgment to the Modrall Firm, which were never signed and

apparently never agreed upon, any suggestion the Wire somehow over-rode the terms of the Pooling Agreement is simply misplaced.

_____

Based on the foregoing, Ferguson's request to determine the Butler Claim paid in full is denied.

## II.     THE COURT APPROVES A REDUCED INTERIM DISTRIBUTION.

Ferguson, and Trustee and Butler, request immediate distribution, either complete or partial.  11 U.S.C. § 726 governs distribution of property of chapter 7 estates but sets no timeline therefor.  In turn, Rule 3009, Fed. R. Bankr. P., provides dividends to creditors in chapter 7 cases "must be paid as soon as practicable."  Interim distributions in chapter 7 cases are, however, unusual because most chapter 7 bankruptcy cases are no-asset cases which result in no distribution to creditors.  Summit Inv. Mgmt., LLC v. Connolly (In re Fog Cap Retail Invs., LLC), 2022 WL 3443685, at *12 (D. Colo. Aug. 17, 2022).  In asset cases, such as this bankruptcy case, "although distribution typically occurs after the court approves the trustee's final report and accounting, the [B]ankruptcy [C]ode does not bar interim distributions and, 'when it benefits the estate to do so, the Court is authorized to approve any interim distribution using its authority pursuant to [11 U.S.C.] § 105(a).'"  Fog Cap Retail, 2022 WL 3443785, at *12 (citing In re Bird, 565 B.R. 382, 400 (Bankr. S.D. Tex. 2017)).  See also Bird, 565 B.R. at 400 (citing In re Van Gerpen, 267 F.3d 453, 456-57 (5th Cir. 2001) (citing In re Wilson, 190 B.R. 860, 862 (Bankr. E.D. Mo. 1996))) ("Typically, distribution is not commenced until the Court approves a trustee's final report and accounting. . . . Nonetheless, the Code does not bar an interim distribution, and, when it benefits the estate to do so, the Court is authorized to approve any interim distribution using its authority pursuant to § 105(a).").

In <u>Bird</u>, the court concluded an interim distribution would benefit the bankruptcy estate and, therefore, would be in its best interest because it would decrease the amount of estate funds used to pay bank fees. <u>Bird</u>, 565 B.R. at 400. Similarly, in <u>Fog Cap</u>, the court found cessation of expenses in connection with related litigation and the ability to capitalize on a carryback tax refund made an interim distribution in the best interest of the bankruptcy estate. <u>Fog Cap</u>, 2022 WL 3443685, at *12. Another bankruptcy court held a 45% interim distribution to be in the best interest of the estate where the deadline to file proofs of claim has long passed so there was little to no risk additional creditors would appear seeking distribution (as is the case here), and administrative expenses and priority unsecured claims have been paid in full. <u>In re Fantaci</u>, 2023 WL 6164906 (Bankr. E.D. La. Sep. 20, 2023).

Here, neither Trustee nor Butler advance how the interim distribution will benefit the bankruptcy estate or creditors. Nevertheless, the Court can identify one primary benefit. Payment of some of the administrative expenses, priority claims, and unsecured claims will serve to minimize, in part, interest accrual on such expenses and claims pursuant to 11 U.S.C. § 726(a)(5) in the event the estate proves to be solvent. A corollary benefit to administrative expense providers and claimants is the receipt of at least partial payment on expenses and claims, many of which have been outstanding and unpaid since the Petition Date in 2019. Consequently, a distribution is in the best interest of creditors and the bankruptcy estate.

Unfortunately, based on Ferguson's obvious litigious nature, this bankruptcy case is, in the Court's judgment, not close to being fully administered. Two Butler state matters remain pending, which in turn mean it is more likely than not the Butler Claim will continue to increase given Ferguson's past litigation behavior and the likelihood of additional appeals causing Butler to incur additional attorney fees and expenses, and interest will continue to accrue on the Butler

Judgment. Additionally, Trustee will continue to incur administrative expenses, such as attorney fees and accounting expenses, the amount of which is not known and difficult to estimate. For these reasons, the Court finds it would not be prudent to leave the estate with only $50,000 to cover these expenses and claims which will undoubtedly continue to be incurred and accrue. The last circumstance this Court has any interest in facing at the end of the case is an administratively insolvent estate and the grueling and otherwise avoidable task of disgorgement.

Rather, if $970,462.82[15] is available to the estate through cash on hand and the Court registry (i.e. the Appeal Bond), the Court will require $250,000 to be retained in the Court registry. Trustee is authorized to use the other $642,844.68 to make an interim distribution in accordance with the Pooling Agreement. The $250,000 plus interest thereon shall remain in the Court registry until the filing and approval of Trustee's final report.

## CONCLUSION

For the reasons set forth above, the Ferguson Motion is DENIED in all respects, and the Trustee Motion is GRANTED in part as follows:

1. $642,844.68 is authorized to be disbursed from the Court's registry to Trustee, with the balance $250,000 to remain in the Court's registry until further order of the Court.

2. From the $720,462.82 (the total of $77,618.14 funds held in Trustee's bank account and the $642,844.68 to be distributed from the Court's registry) then held by Trustee, Trustee is authorized to pay the approved but unpaid administrative expenses of the Modrall Firm and then distribute the balance thereof, 30% to Trustee and 70% to Butler.

---

[15] The Court authorizes the distribution of $642,844.68 from the Appeal Bond.

Case 19-12539-sh7    Doc 281    Filed 10/22/25    Entered 10/22/25 16:20:34 Page 23 of 24

3. The $250,000 remaining in the Court's registry shall be held until Trustee's final report has been approved.

###END OF ORDER###

Case 19-12539-sh7    Doc 281    Filed 10/22/25    Entered 10/22/25 16:20:34 Page 24 of 24